United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 15, 2026

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 25-30348** |
| ADAM KEIRAN MATLACK, | § | |
| | § | **CHAPTER 13** |
| Debtor. | § | |
| | § | |
| CHRISTIE BAIRD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 25-3302** |
| | § | |
| ADAM KEIRAN MATLACK, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Plaintiff Christie Baird seeks a judgment that her claim against Debtor Adam Matlack is excepted from discharge under section 523 of the Bankruptcy Code.[1]  For the reasons explained below, Ms. Baird's claim against Mr. Matlack is excepted from discharge as a debt arising from larceny.  The Court will hold a separate evidentiary hearing on damages.

---

[1] ECF No. 23.

## BACKGROUND

Christie Baird and Adam Matlack first met in 2012 when Ms. Baird started attending Clearpoint Baptist Church in Pasadena, Texas.[2] At the time, Mr. Matlack was an assistant pastor at the church.[3] Ms. Baird regularly attended Bible study/home group meetings at Fred Matlack's (Mr. Matlack's Father's) home and got to know Mr. Matlack better through those meetings.[4]

Mr. Matlack was an early cryptocurrency enthusiast who has been involved in cryptocurrency since at least 2013.[5] Mr. Matlack frequently discussed cryptocurrencies with members of the church community and touted cryptocurrency as a good investment opportunity.[6]

Following the death of her husband in 2014, Ms. Baird sought to invest in cryptocurrency, specifically Bitcoin.[7] In 2017, Ms. Baird reached out to Mr. Matlack requesting that he purchase Bitcoin on her behalf and hold it for her as an investment.[8] Mr. Matlack agreed, and Ms. Baird wired him $80,000.00 from her late husband's bank account on November 28, 2017.[9] Although Ms. Baird and Mr. Matlack did not enter into any written contract reflecting their agreement, it is

---

[2] ECF No. 88, at 21 ¶¶ 3−6.

[3] *Id.* ¶¶ 4−6.

[4] *Id.* at 24, ¶¶ 8−14.

[5] ECF No. 89, at 99 ¶¶ 9−25.

[6] ECF No. 88, at 26−27.

[7] *Id.* at 28 ¶¶ 8−18. "Bitcoin is a cryptocurrency that uses cryptographic principles to allow owners of Bitcoin to securely transact with each other and to prove ownership of Bitcoin via the Bitcoin Blockchain, a decentralized public ledger." *In re Orb Energy Co.*, Case No. 25-80363, 2025 WL 3635773, at *1 n.7 (Bankr. S.D. Tex. Dec. 15, 2025).

[8] ECF No. 88, at 28 ¶¶ 19−25, 29 ¶¶ 1−4.

[9] *Id.* at 30 ¶¶ 2−6. *See also* ECF No. 58-1.

undisputed that the $80,000 was intended to be invested by Mr. Matlack in Bitcoin to be owned by Ms. Baird.[10]

Shortly after Ms. Baird wired Mr. Matlack the $80,000, he represented to her that he used her money to purchase about 8 Bitcoin that now belonged to her.[11]

However, Mr. Matlack did not actually purchase Bitcoin for Ms. Baird at that time.[12]  Instead, he testified that he allocated her around 7.742 Bitcoin out of his personal holdings, allegedly earmarking it as hers in his personal account (a Coinbase account) sometime after he received the $80,000.[13]  According to Mr. Matlack, this earmarking feature, however, was discontinued by Coinbase.[14]  There is no written record reflecting any earmarking.

Some years later, in 2020, Ms. Baird requested that Mr. Matlack transfer control of her Bitcoin to her.[15]  The Bitcoin was intended to be accessible only by use of passwords.  To ensure that the passwords were safe, Mr. Matlack purchased and set up a Trezor device.[16] A Trezor device is a brand of a cryptocurrency cold wallet—a piece of electronic hardware that allows a user to store the private passwords to their cryptocurrency offline.[17]  The passwords are colloquially termed "seed words." The seed words are stored both on a printed card and on the electronic Trezor device. The cryptocurrency, in this case, Bitcoin, is itself on the blockchain, but a cold wallet allows the holder to safely store

---

[10] *Id.* at 33 ¶¶ 8−12; ECF No. 89, at 144 ¶¶ 8−10 ("I counted it as her [Ms. Baird's] Bitcoin.") (Testimony of Adam Matlack).

[11] ECF No. 88, at 34 ¶¶ 20−22.

[12] ECF No. 89, at 143 ¶¶ 21−23.

[13] *Id.* at 157 ¶¶ 4−24.

[14] *Id.* at 164 ¶¶ 4−22.

[15]*Id* at 160 ¶¶ 24−25.

[16] ECF No. 90, at 15 ¶¶ 11−21.

[17] ECF No. 88, at 214 ¶¶ 5−11.

the information required to control and access their Bitcoin. Cold wallet devices, and printed cards stored in a safe, are considered safer than online or "hot" wallets. These methods allow users to store the information required to access and control cryptocurrencies without exposing their "keys" to the internet.[18]

The Trezor device is connected to a computer and provides a user with access to their wallet. When a user sets up a Trezor device, the device provides a 24 word "seed phrase" to allow users to control and access the contents of their wallet if they lose the Trezor device. Anyone with the seed phrase (on a printed card or otherwise) can fully restore and control the wallet and its contents without having possession of the Trezor device.[19]

Mr. Matlack first transferred a nominal amount of cryptocurrency to the Trezor wallet as a "test transaction."[20] He alleges that he then engaged in an escrow swap with an anonymous third party to purchase 7.742 Bitcoin.[21] The Bitcoin was then transferred to Ms. Baird's wallet and was accessible through the Trezor device Mr. Matlack set up for her.[22]

On July 30, 2020, Mr. Matlack and Ms. Baird met at a coffee shop and Mr. Matlack gave Ms. Baird the Trezor device and the seed phrase card, which was sealed in an envelope.[23] Shortly thereafter, she connected the Trezor device to her computer and was able to see the 7.742 Bitcoin in her account.[24] For ease of reference, Ms. Baird's account will be referenced as her "wallet," the term used by the witnesses. Ms.

---

[18] *Id.* at 214−15.

[19] *Id.* at 219 ¶ 25 ("not your seed, not your coins.").

[20] ECF No. 89, at 180 ¶¶ 14−19.

[21] *Id.* at 202 ¶ 9−203 ¶ 22.

[22] *Id.* at 202 ¶¶ 9−19.

[23] ECF No. 88, at 86 ¶¶ 18−25; ECF No. 88, at 39 ¶¶ 8−23.

[24] *Id.* at 45 ¶¶ 2−9.

Baird locked the device and the sealed seed phrase card in her home safe.[25]

On or around August 2, 2020, Ms. Baird checked the wallet and discovered that all the Bitcoin was gone.[26]  Ms. Baird contacted Mr. Matlack about the missing Bitcoin.  He told her that his computer had been hacked, and that her Bitcoin had been stolen along with other cryptocurrency assets he owned.[27]

In August of 2021, Ms. Baird sued Mr. Matlack in the 125th Judicial District Court of Harris County, Texas, for breach of contract, fraud, conversion, and other related causes of action.[28]  That case proceeded through discovery and pre-trial proceedings and was set to be heard in late January 2025.[29]

On January 22, 2025, Mr. Matlack filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court.[30]  Mr. Matlack later converted his case to one under Chapter 13 of the Bankruptcy Code.[31]

---

[25] *Id.*

[26] *Id.* at 46 ¶ 25− 47 ¶ 4.

[27]  *Id.* at 47 ¶¶ 18−25; ECF No. 89, at 197 ¶ 19−198 ¶ 5.

[28] Plaintiff's Original Petition and Request for Disclosures, *Baird v. Matlack*, Case No. 2021-51487 (125th Dist. Ct., Harris County, Tex. Aug. 18, 2021).  While the state court proceedings were mentioned in passing during trial, the parties did not present evidence related to that case.  However, the state court complaint was attached to Ms. Baird's proof of claim.

[29] Setting Reminder, *Baird v. Matlack*, Case No. 2021-51487 (125th Dist. Ct., Harris County, Tex. June 4, 2024).

[30] Case No. 25-30348, ECF No. 1.

[31] Case No. 25-30348, ECF No. 30.

On April 17, 2025, Ms. Baird initiated this adversary proceeding, alleging that her claim against Mr. Matlack is excepted from discharge under section 523 of the Bankruptcy Code.[32]

This case was tried on March 4th, 5th, and 24th.[33]  At trial, the Court admitted documentary evidence, and testimony from multiple witnesses, including one expert witness.[34]  At the conclusion of trial, the Court requested supplemental briefing on one issue and took this case under advisement after receipt of the briefs.[35]

## JURISDICTION & VENUE

28 U.S.C. § 1334(a) provides the District Court with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A) and (B). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

Section 523 of the Bankruptcy Code provides that a discharge under section 1328(b) does not discharge an individual debtor from debts for larceny.  11 U.S.C. § 523(a)(4).  Federal law controls the meaning of "larceny" for the purposes of section 523(a)(4).  *NextGear Capital, Inc. v.*

---

[32] *See* ECF No. 1.

[33] ECF Nos. 69−70, 80.

[34] *See id.*

[35] ECF No. 80.

*Rifai (In re Rifai)*, 604 B.R. 277, 326 (Bankr. S.D. Tex. 2019). Federal common law defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Gomez v. Saenz (In re Saenz)*, Case No. 13-70423, Adv. No. 13-07029, 2014 WL 3888315, at \*5 (Bankr. S.D. Tex. Aug. 8, 2014). Judge Bohm[36] defined the elements of larceny as: (1) the fraudulent and wrongful taking away of the property of another with (2) the intent to convert it to the taker's use and with intent to permanently deprive the owner of such property. *Nibbi v. Kilroy (In re Kilroy),* 357 B.R. 411, 431 (Bankr. S.D. Tex. 2006).

"At a trial on a complaint objecting to a discharge, the plaintiff has the burden of proof." FED. R. BANKR. P. 4005. The plaintiff must establish an exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991). Exceptions to discharge must be narrowly construed against a creditor and liberally construed in favor of a debtor so that a debtor may be afforded a fresh start. *In re Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). However, the relief provided by the bankruptcy system is reserved for the "honest but unfortunate" debtor. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

## DISCUSSION

Ms. Baird alleges that there are multiple grounds for this Court to conclude that her claim against Mr. Matlack is excepted from discharge under section 523 of the Bankruptcy Code.[37] These grounds include fraud, embezzlement, larceny, and willful and malicious injury.[38] Here, the Court determines that the most readily apparent ground present in this case is larceny. The Court need not reach the other grounds asserted.

The question presented is whether it is more likely than not that Mr. Matlack wrongfully took Ms. Baird's Bitcoin with the intent to

---

[36] The Honorable Jeff Bohm retired from the Court in 2019.

[37] ECF No. 23.

[38] *Id.*

convert it to his own use and  permanently deprive her of it.  The Court finds that it is.

Both parties' recollection of events, coupled with the expert testimony regarding Trezor devices and hacking/phishing incidents, provide substantial circumstantial evidence that demonstrates that Mr. Matlack committed larceny.

The core facts are undisputed.  The parties do not dispute that Mr. Matlack transferred the 7.742 Bitcoin to a wallet owned by Ms. Baird.  Nor do they dispute that the wallet was accessible through a Trezor device Mr. Matlack gave to Ms. Baird on July 30, 2020.[39]  Nor do they dispute that on August 1, 2020, someone removed the 7.742 Bitcoin from Ms. Baird's wallet.[40]  The only question before the Court is whether Mr. Matlack is the one who removed the 7.742 Bitcoin.

The Trezor device stored the seed words that gave access to the wallet (and thus, the Bitcoin).[41]  The parties agree that connecting the Trezor device to a computer was not the only way to have accessed the wallet.  Any person with the 24 seed phrase words could also access and remove the Bitcoin.[42]  It is undisputed that no person other than Ms. Baird and Mr. Matlack knew the 24 seed words on July 30, 2020.  It is also undisputed that Ms. Baird did not inform any person of the seed words.  Finally, it is undisputed that Ms. Baird's seed phrase card was stored in Ms. Baird's locked safe.

To enhance the reader's understanding, the seed words were 24 random words that were necessary to access the wallet.  They were stored both on the Trezor device and on a printed card.  The words on

---

[39] ECF No. 88, at 39 ¶¶ 3−23 (Testimony of Christie Baird); ECF No. 90, at 25 ¶¶ 2−10 (Testimony of Adam Matlack).

[40] ECF No. 88, at 46 ¶ 25− 47 ¶ 4 (Testimony of Christie Baird); ECF No. 90, at ¶¶ 11−23 (Testimony of Adam Matlack).

[41] ECF No. 88, at 219 ¶¶ 9−24.

[42] *Id.* at 219 ¶ 8 ("The owner of the seed phrase owns the wallet.") (Testimony of Jonathan Emmons).

the card were handwritten by Mr. Matlack when he set up the Trezor device. He was alone when he created the wallet. Although he denies that he retained a copy of the seed word card, Mr. Matlack had the opportunity to take a photo or to hand write a duplicate of the seed words. The following are the seed phrase words on the card Mr. Matlack gave to Ms. Baird:

| 1. wasp | 2. keen | 3. news | 4. aspect |
|---|---|---|---|
| 5. fiscal | 6. thought | 7. sock | 8. fragile |
| 9. vicious | 10. surge | 11. asset | 12. evil |
| 13. spirit | 14. latin | 15. dry | 16. crunch |
| 17. throw | 18. afraid | 19. chair | 20. solid |
| 21. coral | 22. capital | 23. sister | 24. gentle[43] |

There is minimal direct evidence about what actually happened to Ms. Baird's 7.742 Bitcoin because of the difficulty of tracking Bitcoin absent both the name of the thief and the thief's wallet address.[44] During trial, the Court heard expert testimony from Jonathan Emmons.[45] Considering Mr. Emmon's background, experience, general demeanor, and his response to extensive voir dire, the Court finds that Mr. Emmons was a highly credible expert witness on cryptocurrency, cold wallet technology (including Trezor devices), and hacking/phishing schemes.

Mr. Emmons testified that his examination of the blockchain records shows that after the Bitcoin was removed from the wallet it was split with half going to an unknown address and the other half going to 63 different addresses. The Bitcoin split amongst the 63 addresses was exchanged for other cryptocurrencies.[46] Mr. Emmons testified that he

---

[43] ECF No. 58-6.

[44] ECF No. 88, at 133 ¶¶ 3−12.

[45] ECF Nos. 69−70.

[46] ECF No. 89, at 12 ¶¶ 8−13; 28 ¶¶ 6−16.

would need more information (presumably through a subpoena) to determine ownership.[47]

Even without this information, the Court concludes that Mr. Matlack—rather than someone else—removed Ms. Baird's 7.742 Bitcoin from her wallet.

Mr. Emmons testified that a Trezor device is a type of cold wallet, and that he personally has set up over 100 Trezor devices.[48] When asked to describe what a cold wallet was, Mr. Emmon's answered that:

> A cold wallet is the process of creating a key phrase inside of . . . the process of making a wallet that gets assigned to a hardware device that stores your cell, your . . . data that says you're the owner of anything sent to that cell. So a cold wallet has no access to being on the network that it represents unless I attach my hardware.[49]

Mr. Emmons walked the Court through how Trezor devices work and how to properly set one.[50] When a user sets up a Trezor device, the device provides the user with a 24-word password called a recovery "seed phrase."[51] Only a person with either the physical Trezor device or knowledge of the 24-word seed phrase can access the funds within the wallet.[52] In Mr. Emmons' words, "If you have the seed phrase, you can recreate [the wallet] wherever you are and now you are the sole owner and occupier of it on your new device or on the wallet you established online."[53]

---

[47] ECF No. 88, at 204 ¶¶ 5–20.

[48] *Id.* at 215 ¶¶ 4–21.

[49] *Id.* at 214 ¶¶ 5–11.

[50] *Id.* at 215–32; ECF No. 89, at 5–11.

[51] ECF No. 88, at 230 ¶¶ 5–24.

[52] *Id.* at 220 ¶¶ 8–12.

[53] ECF No. 89, at 20 ¶¶ 16–19.

Mr. Matlack testified that he wrote down the Trezor device seed phrase twice before giving a single seed phrase card to Ms. Baird.[54]  The first time he handwrote the seed phrase on a seed phrase card when he initially setup the device before he initiated a test transaction of .001 Bitcoin.[55]  The second time, he connected the Trezor device to his computer to enable him to copy and paste the wallet address so he could send the 7.742 Bitcoin.[56]  During the second instance, Mr. Matlack testified that after typing the address "wallet.trezor.io" into his browser he received an error message.[57]

According to Mr. Matlack, the error message prompted him to recreate the wallet[58] and he did and wrote down the seed phrase again.[59]  Mr. Matlack testified that the second time, however, he was prompted to confirm each seed phrase word on the computer—a step that was not part of the initial setup.[60]  Mr. Matlack did not think that being asked to type in the seed phrase words was suspicious when he set up the Trezor device for the second time.[61]  After Mr. Matlack completed setting up the Trezor device the second time, he initiated the transfer of 7.742 Bitcoin to Ms. Baird's wallet via an escrow swap.[62]

Mr. Matlack testified that after completing this transaction and giving the device to Ms. Baird, the next time he used his computer his screen was flooded with Metamask transaction notifications.[63]

---

[54] *Id.* at 202 ¶¶ 4−11.

[55] *Id.* at 179 ¶ 21−180 ¶ 19.

[56] *Id.* at 183 ¶¶ 16−22.

[57] *Id.* at 184−186.

[58] *Id.* at 186 ¶¶ 23−25.

[59] *Id.* at 187 ¶¶ 9−14.

[60] *Id.* at 188 ¶¶ 12−20.

[61] *Id.* at 190 ¶¶ 3−8.

[62] *Id.* at 203 ¶¶ 16−22.

[63] ECF No. 90, at 25 ¶¶ 14−25.

Metamask is a browser extension that shows various cryptocurrency holdings in various exchanges.[64] He testified that his computer was "frozen basically" and he was unable to use it.[65] Mr. Matlack alleged that he believed that his computer was hacked and wiped all data from his computer and reinstalled windows.[66] He made no backup prior to destroying the data.

As a result of this alleged hacking incident, Mr. Matlack claims that he lost over $150,000 from accounts connected to his Metamask.[67] After this alleged hack, Mr. Matlack took no action to try to determine what happened to his stolen money[68] and he presented no evidence relating to this hack or the loss of any cryptocurrency assets.[69]

Since the time of the incident, Mr. Matlack testified that he has come to believe that it was highly likely that he was hacked.[70] He believes that the hack occurred either before or during the second time he set up the Trezor device.[71] According to Mr. Matlack, this may have occurred when he inadvertently entered the wrong Trezor website in his browser.[72] He alleges that he now believes he was directed to a lookalike website.[73] Alternatively, he alleges that his computer was already compromised before he used the Trezor device the second time.[74]

---

[64] *Id.* at 58 ¶¶ 17−20.

[65] *Id.* ¶¶ 22−24.

[66] *Id.* at 26 ¶¶ 2−10.

[67] ECF No. 89, at 197 ¶ 24−198 ¶ 5.

[68] *Id.* at 198 ¶¶ 6−16.

[69] *Id.* at 201 ¶ ¶ 14−25.

[70] ECF No. 90, at 45 ¶ 22−25.

[71] *Id.* at 41 ¶¶ 5−9.

[72] ECF No. 89, at 194 ¶¶ 10−12.

[73] *Id.*

[74] ECF No. 90, at 41 ¶ 5−9.

Rather than investigating, Mr. Matlack erased all memory on his computer.[75]  His version of events cannot be verified because of his own destruction of the history of the events.

Indeed, virtually all of Mr. Matlack's version of events is unconvincing.  The removal of Ms. Baird's Bitcoin from her wallet on August 1, 2020, is inconsistent with a hack/phish.  Mr. Emmons testified that if a user's seed phrase is exposed to hackers through a phishing scheme, a hacker would instantly recreate the wallet and immediately remove any cryptocurrency contained in the wallet.[76]  The true owner of the wallet loses access to everything immediately.[77]

Mr. Emmon's testified that this theft process is entirely automated and instantaneous.[78]  As soon as a user exposes their seed phrase to a phish, any funds held in the wallet are immediately extracted.[79]  He further testified that phishing attackers do not leave large balances sitting in a compromised wallet for extended periods of time.[80]  This is because if a hacker does not instantly remove any cryptocurrency contained in a compromised wallet that it places them at risk of losing any funds which they have gained illegitimate access to through the phishing scheme.[81]

Here, the Trezor device ledger indicates that Mr. Matlack first transferred 0.001 Bitcoin to the wallet on July 28, 2020, at 5:24 p.m.[82]  Then, on July 30, 2020, at 10:50 a.m., he caused 7.742 Bitcoin to be

---

[75] *Id.* at 26 ¶¶ 2−10.

[76] ECF No. 89, at 24 ¶¶ 10−22.

[77] *Id.* at 23 ¶¶ 1−8.

[78] *Id.* at 24 ¶¶ 10−22.

[79] *Id.*

[80] *Id.* at 25 ¶¶ 17−20.

[81] *Id.* at 26 ¶¶ 15−20.

[82] ECF No. 58-5, at 2.

transferred to the wallet via a third-party escrow swap.[83] Two days later, on August 1, 2020, at 5:10 p.m., 7.742 Bitcoin was removed from the wallet.[84] There was a period of 54 hours and 20 minutes between the transfer of the 7.742 Bitcoin and when the funds were removed. This lengthy period of time is inconsistent with a hacking/phishing incident.

According to Mr. Emmons, his examination of the Trezor blockchain indicated that on August 1, 2020 the wallet was recreated.[85] Mr. Emmons testified that it was not possible to hack a Trezor device unless it is physically connected to a computer, and if is not connected to a computer, the only way a third party could remove cryptocurrency from a Trezor wallet is to have the seed phrase, recreate the wallet, and remove any cryptocurrency in the wallet.[86]

At the time the wallet was recreated, the Trezor device was stored in Ms. Baird's home safe.[87] Thus, only a person with the seed phrase could have removed any cryptocurrency from the wallet. Ms. Baird did not have the technical expertise, nor any incentive, to undertake the theft of her own Bitcoin.

Only two people had ever seen the seed phrase: Mr. Matlack and Ms. Baird. Mr. Matlack saw the seed phrase twice and wrote it down twice when he set up the Trezor device on two separate occasions. Mr. Matlack testified that at some point he tore up and threw away the first seed phrase card.[88] However, the Court finds that after Mr. Matlack gave Ms. Baird the Trezor device, he used the seed phrase to recreate the wallet and transferred the Bitcoin for his own benefit.

---

[83] *Id.*

[84] *Id.*

[85] ECF No. 89, at 22 ¶¶ 2−10.

[86] *Id.* at 19−21.

[87] ECF No. 88, at 45 ¶¶ 2−9.

[88] ECF No. 90, at 20 ¶¶ 17−21.

The Court did not find Mr. Matlack to be a credible witness. Throughout the trial, his testimony was riddled with inconsistencies and "Clintonesque" responses. *See Lain v. ZC Specialty Ins. Co. (In re Senior Living Props., LLC*, 309 B.R. 223, 250 (Bankr. N.D. Tex. 2004). Part of Mr. Matlack's defense was that this was simply a mistake[89] made by someone who does not consider themselves to be sophisticated in cryptocurrencies.[90]   When asked about his level of competency in cryptocurrency, the following exchange between Ms. Baird's counsel, Mr. Cobos, and Mr. Matlack took place:

| | |
|---|---|
| Mr. Cobos: | Is it a fair characterization to say that you are sophisticated about matters of cryptocurrency? |
| Mr. Matlack: | I --- I don't know what that -- it depends on how you determine what sophisticated it means. |
| Mr. Cobos: | What does the word sophisticated mean to you? |
| Mr. Matlack: | I don't know. Is that -- to be frank, it means really smart or above average or way -- way above. |
| Mr. Cobos: | Let us try that. Were you really smart when it came to matters of cryptocurrency? |
| Mr. Matlack: | No, I wouldn't say that. No.[91] |

However, the evidence introduced at trial demonstrated that Mr. Matlack is extremely sophisticated in matters involving cryptocurrencies.   Mr. Matlack testified that he has owned various

---

[89] *Id.* at 63 ¶¶ 22–24.

[90] ECF No. 89, at 103–104.

[91] ECF No. 89, at 103 ¶¶ 13–22.

cryptocurrencies since 2013[92] and has moved cryptocurrency across accounts on multiple cryptocurrency exchanges.[93]  He was formerly the Chief Executive Officer of the Paycoin Foundation, a company linked to the cryptocurrency Paycoin.[94]  And at a time, he held himself out on his public LinkedIn profile as a Blockchain and Distributed Ledger Technology ("DLT") Consultant.[95]

Mr. Matlack was also formerly the Chief Strategist of company called Ionomy, which ran a cryptocurrency exchange and developed a proprietary cryptocurrency called ION.[96]  And his 2017 joint tax return filed with his ex-wife, Nicole Wilkins, showed that in 2017 he acquired and sold over $8.6 million in cryptocurrency, totaling 17.2 million in transactions in that year alone.[97]

Mr. Matlack's testimony about the alleged hacking was also inconsistent.  At one point during trial, Mr. Matlack testified that due to the hack he suffered that he lost all the contents on his MetaMask account, approximately $150,000.[98]  However, he also testified that after he allegedly suffered the hack that he had about 10 Bitcoins in his Coinbase account.[99]  Despite having these significant cryptocurrency assets, less than a year earlier, Mr. Matlack's divorce decree did not list any cryptocurrency as either separate or community property.[100]

When Mr. Matlack discovered that he had lost nearly $150,000 in the alleged hacking incident, he did nothing (other than destroy the

---

[92] ECF No. 89, at 99 ¶¶ 9−24.

[93] *Id.* at 100 ¶¶ 16−101 ¶ 3.

[94] *Id.* at 107 ¶¶ 16−17.

[95] ECF No. 58-16.

[96] ECF No. 89, at 109 ¶ 24−110 ¶ 24.

[97] ECF No. 58-27, at 8.

[98] ECF No. 89, at 198 ¶¶ 2−5.

[99] *Id.* at 218, ¶¶ 18−24.

[100] ECF No. 59-7.

evidence of any hack by wiping his computer).[101]  He did not report the loss to any authorities or take any steps to try to recover the lost funds.[102]  He did not try to take any steps to remedy Ms. Baird's loss of a significant portion of her retirement funds, despite his alleged suspicions that he might have been at fault.[103]  Mr. Matlack claims that he did not do anything because "[i]t was in the middle of  COVID and [he] was literally weeks away from [his] son being born."[104]   Mr. Matlack's lackluster response is entirely inconsistent with someone who allegedly lost $150,000 weeks before having a child.  The Court does not find his testimony to be credible.

It is worth noting that Mr. Matlack has publicly commented on concealing cryptocurrency assets.  In November 2020, in response to a tweet by Coinbase CEO, Brian Armstrong, regarding regulations of cryptocurrencies, Mr. Matlack tweeted: "[i]f even a shred of this is true (in terms of the rumors) the feds can pound sand for all I care. Boat accidents for crypto wallets incoming."[105]  A "boat accident" is a joke that originated in the firearms community that has been co-opted by the cryptocurrency community.[106]  Mr. Cobos asserted that the phrase "losing your wallet in a boating accident" is a joke in the cryptocurrency community about making cryptocurrency disappear so the authorities can't get it.[107]

When asked about this tweet, Mr. Matlack stated that his reference to "boat accidents" was due to his belief that people would not

---

[101] ECF No. 89, at 198 ¶¶ 2−21.

[102] *Id.*

[103] *Id.* at 221 ¶ 4 ("I wasn't trying to solve the problem.").

[104] *Id.* ¶ 19−20.

[105] ECF No. 58-19.

[106] ECF No. 89, at 135 ¶¶ 1−6.

[107] *Id.* at 134 ¶ 23−135 ¶ 3.

claim their assets.[108]   He also noted that due to the nature of cryptocurrency it is difficult to prove ownership of cryptocurrency assets.[109]   Additionally, Ms. Wilkin's testified that Mr. Matlack told her one of the reasons he got into crypto was because it was not as easily monitored as cash and digital transactions of bank accounts.[110]

Mr. Matlack argued that much of the evidence presented at trial was introduced to assassinate his character, including the testimony of his ex-wife, Nicole Wilkins.  The character testimony focused on other bad acts by Mr. Matlack.[111]  The Court's decision, however, does not rely on any of that character evidence to reach its decision.  Separate from the character evidence was the evidence of pattern discussed below.  That pattern bolsters the Court's conclusion.

At trial, Ms. Baird offered the testimony of Nicole Wilkins.[112]  Ms. Wilkins testified that during her marriage to Mr. Matlack, he set up a Trezor wallet for her, and told her that he had funded it with $1 million of Bitcoin.[113]  She testified that about 1 week after their divorce, Mr. Matlack gave her a seed phrase card for a Trezor wallet.[114]  Ms. Wilkins testified that she later checked the wallet to find that there was no Bitcoin in it.[115]  When Ms. Wilkins confronted Mr. Matlack about the missing Bitcoin, he said that his computer had been hacked and somebody had stolen the Bitcoin from him.[116]

---

[108] ECF No. 89, at 137 ¶ ¶ 2−13.

[109] *Id.*

[110] ECF No. 88, at 180 ¶¶ 5−18.

[111] ECF No. 90, at 60 ¶¶ 8−13.

[112] *See* ECF No. 69.

[113] ECF No. 88, at 121−22.

[114] *Id.* at 122 ¶ 12.

[115] *Id.* at 122 ¶¶ 23−25.

[116] *Id.* at 126 ¶ 21−127 ¶ 1.

Ms. Wilkins' testimony, if true, is compelling pattern evidence as the content of her testimony is almost exactly what happened in this case. *See* FED. R. EVID. 404(b)(2). In her declaration, which was admitted only for impeachment purposes, she stated that she had possession of both a "cold wallet" and a "seed phrase card."[117] Her declaration continues that she "connected" the cold wallet to her computer to check the balance and found that the wallet was empty.[118]

However, at trial she testified that she was only given a seed phrase card—not a Trezor device.[119] Ms. Wilkins testified that she viewed the zero balance without connecting the Trezor device on the "computer screen where you have to put in the code."[120] Ms. Wilkins was apparently confused and conflated a cold wallet and a seed phrase card.[121] At trial the following exchange took place between the Court and Ms. Wilkins regarding viewing the zero balance on the Trezor wallet:

> The Court: Okay. So tell me what you did.
>
> Ms. Wilkins: I went to the Trezor thing on the computer and then you don't have the device, you have to use the seed code to, like, reinstate or regenerate or whatever you want to call bringing up the wallet without the little plug-in part. And then it asks you for your seed phrase, which is the list of words that you have to type in in a specific order in order to make -- in order to be able to access the wallet.

---

[117] ECF No. 58-26 ¶ 10.

[118] *Id.* ¶ 11.

[119] ECF No. 88, at 121 ¶¶ 23−25.

[120] *Id.* at 159 ¶¶ 17−25.

[121] *Id.* at 163 ¶¶ 7−10.

The Court:        Okay. So what did you do?

Ms. Wilkins:      I typed in the words in the order that they were numbered on the paper, and then, like, you click enter or whatever on the screen, and then it comes up with, like, a little black rectangle thing that looks not like a real wallet, but it says, like, a dollar amount on the screen and tells you, like, in bitcoin how much is on there, and then in U.S. dollars how much is on there, generally, I think.

The Court:        Does it verify that what you typed in was a valid set of words?

Ms. Wilkins:      The only way you can, like, it'll bring up the wallet is if it is a valid -- like, if you mistype it, I think it just gives you an error message or something. I'm not sure exactly what happens if you do it wrong.

The Court:        Okay. And so what did it show you then?

Ms. Wilkins:      It just had, like, a zero balance. Like, a little green zero on it, the screen.[122]

Mr. Emmons testified that a user could recreate a wallet by typing in the seed phrase words to an online wallet that uses the same technology as Trezor wallets, called BIP39.[123] He testified that BIP39 is the security metric that 80% of wallets use.[124] However, Mr. Emmons testified that "there's not an opportunity with Trezor's system to do it

---

[122] *Id.* at 183 ¶ 16−184 ¶ 15.

[123] ECF No. 88, at 227 ¶¶ 2−23.

[124] *Id.* at 219 ¶¶ 23−24.

without a device. But there are other companies that are compatible with Trezor's technology."[125]

The timing of the incident which Ms. Wilkins testified about was slightly confusing. Ms. Wilkins' declaration stated that Mr. Matlack gave her the seed phrase card before the divorce.[126] However, she testified that Mr. Matlack put $1 million on the cold wallet "[a]fter the paper divorce and before he moved out."[127]

Mr. Matlack's version of the same events makes no sense. When asked about Ms. Wilkins' testimony, the following exchange took place:

| | |
|---|---|
| Mr. Cobos: | You gave her a seed phrase card to a cold wallet that had a million dollars in bitcoin, didn't you? |
| Mr. Matlack: | So I -- no, that's not true. |
| . . . | |
| Mr. Cobos: | Okay. Well, tell me. What happened? |
| Mr. Matlack: | At some point in I believe it was 2019. I'm pretty sure it had to be. In one of our conversations, I don't really know, it talked about -- like, she mentioned the idea that what happens if something happens to me. And so, you know, can you get access to stuff or all this stuff? And so I took that and was like, I had the intention of making a -- essentially, I wouldn't call it a cold wallet, but a wallet that she had the private keys to. So that if something happened to me, she would be able to |

---

[125] *Id.* at 227 ¶¶ 6–14.

[126] ECF No. 58-26 ¶ 10.

[127] ECF No. 88, at 167 ¶ 17.

| | |
|---|---|
| | access it. And the intent was for me to put  money on it. |
| Mr. Cobos: | Did you put money on it? |
| Mr. Matlack: | No, sir. |
| Mr. Cobos: | You gave her a cold wallet with the intent that she would be able to access it if something happened to you. |
| Mr. Matlack: | Correct. That was the reason why I gave her the card. Well, it was just a piece of paper. It wasn't a card.[128] |

The Court did not find Mr. Matlack's testimony to be credible because it makes no sense for him to give her the seed phrase or "keys" to a wallet that was not funded.

The Court observed Ms. Wilkins testimony and found her to be credible.  While there were some inconsistencies in her testimony, she was testifying about events that occurred over six years ago, and she is not sophisticated in matters involving cryptocurrency.  While the Court acknowledges that Ms. Wilkins is both Mr. Matlack's ex-wife and friends with Ms. Baird, these considerations do not render her testimony incredible.  They do affect the weight the Court should afford her testimony.

Mr. Matlack is a sophisticated user of cryptocurrency and the only person who had access to Ms. Baird's seed phrase other than her.  Mr. Matlack's background and experience in cryptocurrency make him capable of recreating a cryptocurrency wallet and dividing its contents so that it cannot easily be traced.  And he has publicly joked about concealing cryptocurrency assets from the government in the past.  His attempts to divert blame for this incident to a hacking/phishing scheme are unconvincing, and the sequence of events in the record is entirely inconsistent with how hacking/phishing schemes work.

---

[128] ECF No. 89, at 129 ¶ 14−130 ¶ 10.

Mr. Matlack was not a credible witness. He offered no corroborating evidence in support of his defense, as he wiped all of the data from his allegedly hacked computer. He was unable to provide any tangible evidence that he suffered any losses as a result of the alleged hack. Additionally, although the Court's conclusion does not rely on Ms. Wilkins' testimony that Mr. Matlack had previously engaged in nearly identical conduct, her testimony bolsters the conclusion that Mr. Matlack misappropriated Ms. Baird's Bitcoin.

The Fifth Circuit has held that a creditor may rely on circumstantial evidence to prove a debtor's state of mind for purposes of nondischargeability. *In re Mercer*, 246 F.3d 391, 409 (5th Cir. 2001). And in the context of nondischargeability on account of embezzlement under 11 U.S.C. § 523(a)(4), bankruptcy courts have held that both a wrongful appropriation and intent may be proved by circumstantial evidence. *Bluegrass Stockyards of Campbellsville, LLC v. Smith (In re Smith)*, 429 B.R. 864, 871 (Bankr. W.D. Ky. 2010). Ms. Baird has shown by a preponderance of the evidence that Mr. Matlack fraudulently and wrongfully took her Bitcoin with the intent to convert it to his own use and with the intent to permanently deprive her of it.

## CONCLUSION

Ms. Baird's claim against Mr. Matlack is excepted from discharge under 11 U.S.C. § 523(a)(4) as a debt arising from Mr. Matlack's commission of larceny. The Court will hold an evidentiary hearing on the amount of damages on May 26, 2026, at 9:00 a.m.

SIGNED 04/15/2026

Marvin Isgur
United States Bankruptcy Judge